

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

**NO. 02-15-00328-CV**

LON SMITH & ASSOCIATES, INC.                                      APPELLANTS
AND A-1 SYSTEMS, INC., D/B/A
LON SMITH ROOFING AND
CONSTRUCTION

V.

JOE KEY AND STACCI KEY                                           APPELLEES

----------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 236-267881-13

----------

## OPINION

----------

### I. INTRODUCTION

This is an interlocutory appeal from an order certifying a class action.[1]

Appellants Lon Smith & Associates, Inc. and A-1 Systems, Inc., d/b/a Lon Smith

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3) (West Supp. 2016).

Roofing and Construction[2] raise five issues claiming that the trial court erred by certifying a class because various class-certification requirements of Texas Rule of Civil Procedure 42 were not met.[3]  For the reasons set forth below, we will affirm that portion of the trial court's October 15, 2015 "Order Certifying Class Action with Trial Plan" that certifies for class treatment Joe and Stacci Keys' declaratory-judgment claim and the Keys' Deceptive Trade Practices Act (DTPA) claim based on section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code); we will reverse the portion of the trial court's October 15, 2015 "Order Certifying Class Action with Trial Plan" that certifies for class treatment the Keys' DTPA claim based on section 17.50(a)(3)[4] (Unconscionability); and we will remand this cause to the trial court: (1) with instructions to decertify the DTPA

---

[2]We will refer to Lon Smith & Associates, Inc. as "Associates" and to A-1 Systems, Inc., d/b/a Lon Smith Roofing and Construction as "A-1."  We will refer to Associates and A-1 collectively as "LSRC."

[3]LSRC includes numerous contentions in the text of each of its five issues but does not restate the issues in connection with its briefing on the merits. LSRC briefs some of these individual contentions in multiple portions of its briefing on the merits, while failing to brief other contentions.  In its briefing on the merits, LSRC includes several stand-alone, one- or two-sentence complaints untethered to a stated issue.  We will address the individual contentions that LSRC addresses in multiple portions of its brief only once.  We will not address any contention stated in an issue that LSRC did not brief.  Finally, we will address any stand-alone complaint to the extent it is fairly subsumed within a stated and briefed issue.  *See, e.g.*, *Bullock v. Am. Heart Ass'n*, 360 S.W.3d 661, 665 (Tex. App.—Dallas 2012, pet. denied).

[4]*See* Tex. Bus. & Com. Code Ann. § 17.50(a)(3) (West 2011).

section 17.50(a)(3) (Unconscionability) claim, and (2) for further class proceedings.

## II. FACTUAL BACKGROUND, EXISTING LEGAL LANDSCAPE, AND CERTIFICATION HEARING AND ORDER

### A. The Keys' Lawsuit

A May 2011 hailstorm damaged the roof of the Keys' residence. The Keys notified their homeowners' insurance carrier of the damage, and Joe signed a contract with A-1 for the installation of a new roof with a total price of $33,769.50. Stacci did not sign the contract; the Keys allege that Joe signed it on her behalf. The "Acceptance and Agreement" provision of the contract provided that

> [t]his Agreement is for FULL SCOPE OF INSURANCE ESTIMATE AND UPGRADES and is subject to insurance company approval. By signing this agreement homeowner authorizes Lon Smith Roofing and Construction ("LSRC") to pursue homeowners['] best interest for all repairs, at a price agreeable to the insurance company and LSRC. The final price agreed to between the insurance company and LSRC shall be the final contract price.

A-1 installed the new roof. The Keys paid their homeowners' insurance proceeds of $18,926.69 to A-1, leaving a balance on the $33,769.50 amount. To collect the amount A-1 claimed that the Keys owed, A-1 filed suit against Joe in a justice court and obtained a default judgment. Joe subsequently challenged the default judgment and obtained a June 23, 2015 judgment setting it aside as void. A-1 appealed the June 23, 2015 judgment to the county court at law. *See* Tex. R. Civ. P. 506.1.

3

Meanwhile, in September 2013, the Keys sued LSRC, asserting that the Acceptance and Agreement provision in the contract with A-1, which did business collectively with Associates, violated Texas Insurance Code section 4102.051's prohibition against a corporation acting or holding itself out as a public insurance adjuster in the absence of a license. *See* Tex. Ins. Code Ann. § 4102.051(a) (West Supp. 2016). Accordingly, the Keys claimed the agreement was illegal, void, and unenforceable. *See id.* § 4102.207(a), (b) (West 2009) (setting forth remedies for violation of chapter 4102).

Based on the alleged illegality of LSRC's agreement under section 4102.051, the Keys pleaded a claim for declaratory relief—to declare the agreement with LSRC illegal, void, and unenforceable and to declare, consequently, that they and other class members are "entitled to a judgment restoring all monies paid to [LSRC] under the illegal contract" pursuant to the statutory remedy provided by section 4102.207(b). *See* Tex. Ins. Code Ann. §§ 4102.051, .207(b); Tex. Civ. Prac. & Rem. Code Ann. §§ 37.002, .011 (West 2015). The Keys also pleaded causes of action for damages based on DTPA violations, fraud, violations of the Texas Debt Collection Practices Act, and fraudulent use of court records.

In due course, the Keys obtained class certification of their declaratory-judgment claim and their DTPA claims under sections 17.50(a)(3)

4

(Unconscionability) and 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code).[5]

## B.  Chapter 4102 of the Texas Insurance Code

The Texas Legislature enacted chapter 4102 of the Texas Insurance Code effective September 1, 2005.  *See* Act of May 24, 2005, 79th Leg., R.S., ch. 728, § 11.082(a), 2005 Tex. Gen. Laws 2259, 2259–72 (codified at Tex. Ins. Code Ann. §§ 4102.001–.208).  Chapter 4102 is a comprehensive licensing statute regulating public insurance adjusters.  *See* Tex. Ins. Code Ann. §§ 4102.001–.208 (West 2009 & Supp. 2016).  According to an amicus brief tendered in this case by the National Association of Public Insurance Adjusters and the Texas Association of Insurance Adjusters, forty-five states plus the District of Columbia have enacted such statutes.[6]

Chapter 4102 expressly prohibits a "person" from acting as a public insurance adjuster in Texas without a license.  *See* Tex. Ins. Code Ann. § 4102.051(a) (providing that "[a] person may not act as a public insurance adjuster in this state or hold himself or herself out to be a public insurance adjuster in this state unless the person holds a license issued by the commissioner").  The term "person" is defined as including a corporation.  *Id.*

---

[5]The Keys sought class certification of other claims as well, but the trial court certified only these three claims.

[6]North Texas Roofing Contractors Association and Stellar Restoration Services, LLC both tendered amicus briefs as well.

§ 4102.001(2). And a "public insurance adjuster" is "a person who, for direct, indirect, or any other compensation . . . acts on behalf of an insured in negotiating for or effecting the settlement of a claim or claims" while acting as a public insurance adjuster and "also includes advertising, soliciting business, and holding oneself out to the public as an adjuster of claims." *Id.* § 4102.001(3)(A)(i), (ii). A licensed public insurance adjuster is expressly prohibited from participating directly or indirectly in the reconstruction, repair, or restoration of damaged property that is the subject of a claim adjusted by the license holder; acting as a public insurance adjuster and a contractor on the same claim is a statutorily-defined conflict of interest. *Id.* § 4102.158(a)(1).[7] Any contract for services regulated by chapter 4102 that is entered into by an insured with a person in violation of the chapter's licensing requirements "may be voided at the option of the insured." *Id.* § 4102.207(a). If a contract is so voided, "the insured is not liable for the payment of any past services rendered, or future services to be rendered, by the violating person under that contract or otherwise." *Id.*

## C. The *Reyelts* Opinion

In addition to Texas Insurance Code chapter 4102, the legal landscape forming the basis of the Keys' motion for class certification includes a federal

---

[7] *See also* Tex. Dep't Ins. Comm'r Bulletin B-0051-08 (Aug. 8, 2008) (warning that "contractors may not act on behalf of an insured in negotiating or effecting settlement of claims for loss or damage under any policy of insurance").

court case, *Reyelts v. Cross*, 968 F. Supp. 2d 835 (N.D. Tex. 2013), *aff'd*, 566 F. App'x 316 (5th Cir. 2014).[8]  The Keys cited and relied upon the *Reyelts* case in their pleadings and in their motion for class certification.[9]

In the *Reyelts* case, the Reyeltses signed a contract with LSRC.[10]  *Id.* at 839.  The Reyeltses' contract with LSRC, like the contract signed by Joe, contained the provision quoted above.  *See id.*  The Reyeltses alleged, and Magistrate Judge Cureton found, that the inclusion of the Acceptance and Agreement provision in the contract rendered it "illegal, void[,] and unenforceable" as violative of Texas Insurance Code chapter 4012 and that the Reyeltses were not liable for payment of any past or future services rendered

---

[8]The Reyeltses filed suit against Lon Smith & Associates, Inc. and A-1 Systems, Inc., d/b/a Lon Smith Roofing and Construction, its owner Cary Jay Cross, and its retained debt collector Cary J. Cross, P.C.

[9]The Fifth Circuit's *Reyelts* affirmance is unpublished and therefore is not precedential except for the limited circumstances set forth in Fifth Circuit Rule 47.5.4, which are not present here.  *See* 5th Cir. R. 47.5.4.  Magistrate Judge Jeffrey L. Cureton's memorandum opinion and order in the *Reyelts* case, however, constitutes persuasive authority, enunciating guiding principles applicable here.  *See* 28 U.S.C.A. § 636(c)(1), (3) (West 2009) (providing that in consent cases before a United States magistrate judge, a magistrate judge's order carries the same weight as an order of a federal district judge).

[10]The Reyeltses, like the Keys, filed suit against Lon Smith & Associates, Inc. and A-1 Systems, Inc., d/b/a Lon Smith Roofing and Construction.  *Reyelts*, 968 F. Supp. 2d at 835.  In the *Reyelts* opinion, these defendants are collectively referred to as "the Lon Smith Defendants," while here we refer to them as the parties do—as LSRC.  *See id.* at 838.

under the agreement. *See id.* at 843–44; *see also* Tex. Ins. Code Ann. §§ 4102.206(a), .207(a), (b).[11]

In *Reyelts*, Magistrate Judge Cureton also determined that LSRC had "engaged in an unconscionable action or course of action as prohibited by section 17.50(a)(3) of the DTPA." 968 F. Supp. 2d at 844. He found that LSRC had used an "agreement that was and is illegal and violative of Chapter 4102 of the Texas Insurance Code [and] constituted an act or practice in violation of Chapter 541 of the Texas Insurance Code and, thus, a violation of section 17.50(a)(4) of the DTPA." *Id*. Magistrate Judge Cureton found that LSRC committed such wrongful conduct knowingly and intentionally and ultimately signed a judgment awarding the Reyeltses their economic damages, mental anguish damages, a trebling of the economic damages, court costs, and reasonable and necessary attorney's fees. *Id*. at 845.

---

[11]During the class-certification hearing, the Keys informed the trial court that in addition to Magistrate Judge Cureton in *Reyelts*, a Tarrant County judge, Judge Donald J. Cosby in *Spracklen*, had held that a contract containing a provision that purportedly authorized a roofing contractor to act as an insurance adjuster for the insured was illegal, void, and unenforceable. A copy of the *Spracklen* partial summary judgment was provided to the trial court. *See Spracklen v. Hill*, No. 067-276646-15 (67th Dist. Ct. Tarrant Cty., Tex. May 19, 2015) (granting partial summary judgment for the Spracklens; declaring that "the contracts of Defendant identified in the summary judgment record are hereby declared illegal, void[,] and unenforceable, and Plaintiffs are not liable for the payment of any past services rendered, or future services to be rendered, by Defendant under those contracts or otherwise"; and citing Insurance Code sections 4102.206(a) and 4102.207(a), (b) and *Reyelts*, 968 F. Supp. 2d at 843–44).

## D.  Class-Certification Requisites[12]

All class actions must satisfy the four threshold requirements contained in Texas Rule of Civil Procedure 42(a):  (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").  Tex. R. Civ. P. 42(a)(1)–(4); *see Bernal*, 22 S.W.3d at 433.  In addition to the subsection (a) prerequisites, class actions also must satisfy at least one of the subdivisions of rule 42(b).  *See* Tex. R. Civ. P. 42(b) (subsection (b) directs that only certain kinds of actions can be class actions); *Bernal*, 22 S.W.3d at 433.  The plaintiffs, here the Keys, bore the burden of establishing each of the requisites for class certification.  *See, e.g.*, *Bailey v. Kemper Cas. Ins. Co.*, 83 S.W.3d 840, 847 (Tex. App.—Texarkana 2002, pet. dism'd w.o.j.).

## E.  The Class-Certification Hearing

At the hearing on the Keys' motion for class certification, both the Keys and LSRC presented evidence.  Joe Key testified that he had signed the contract with LSRC.  Joe testified that Thomas Kirkpatrick, an A-1 salesman and

---

[12]Because Texas Rule of Civil Procedure 42 is patterned after Federal Rule of Civil Procedure 23, federal class-certification authority is persuasive in our analysis of state class-certification issues.  *See Sw. Ref. Co. v. Bernal*, 22 S.W.3d 425, 433 (Tex. 2000).

9

estimator, said LSRC was "handling everything as far as insurance." According to Joe, LSRC never told him that he could or should get a public insurance adjuster involved in his roof-damage claim under his homeowners' policy. Joe understood that LSRC was contracting to discuss his insurance claim with his insurer and was also contracting to repair his roof. But the Keys' insurer did not pay LSRC the price ultimately set forth in the LSRC contract, and LSRC sued Joe in a justice court for the difference. Joe explained that he was suing LSRC to recover the monies paid under the contract and that if the class were certified, he would seek recovery of those same monies for each class member—that is, the monies each class member paid LSRC for a new roof pursuant to an illegal, void contract.

In support of their motion for class certification, the Keys admitted into evidence the deposition of David Cox, the corporate representative for A-1, and the exhibits attached to Cox's deposition. Cox's deposition and the attached exhibits established that since 2003, A-1 has utilized a standard form contract containing the Acceptance and Agreement provision, which the Keys and thousands of others have signed. Included in the Keys' evidence was A-1's admission, in response to the Keys' requests for admission, that A-1 was not and never had been a licensed public insurance adjuster.

In their brief in support of their motion for class certification, the Keys explained,

10

The issue here is simple—given the existence of thousands of standardized form contracts that have been held by multiple courts to be "illegal, void, and unenforceable," is it more appropriate for the claims arising from the illegal contract to be adjudicated in one big lawsuit or in thousands of smaller lawsuits scattered around the State? The answer is clear—this case should be certified to proceed as a class.

At the class-certification hearing, LSRC proffered no live testimony but obtained admission of nineteen exhibits.[13] Twelve of LSRC's nineteen exhibits related to, or were documents filed in, the *Reyelts* case. LSRC's exhibits O and P are the "Memorandum Opinion and Order and Findings of Fact And Conclusions of Law" and the final judgment against LSRC, respectively, that were signed by Magistrate Judge Cureton in the *Reyelts* case.

### F. The Class-Certification Order

The trial court signed a twenty-two page "Order Certifying Class Action with Trial Plan." The trial court found that the Keys had met their burden of establishing the class-certification requirements of rule 42(a), 42(b)(3), 42(b)(2), and 42(b)(1)(A).

---

[13]LSRC's exhibits included the following: (1) Letter to Joe Key dated 11/7/11; (2) Statement of loss; (3) Claim journal; (4) Agreement; (5) Affidavit of Kathryn Shilling; (6) Insurance Commissioner's Bulletin B-0051-08; (7) Texas Department of Insurance - Frequently asked questions; (8) Affidavit of Robert C. Wiegand; (9) Plaintiffs' Rule 12(c) Motion; (10) Plaintiffs' Notice of Defendants' Failure to File Response; (11) Order Granting Plaintiffs' Rule 12(c) Motion; (12) Plaintiffs' Motion for Leave to File First Amended Original Complaint and Brief; (13) Order Granting Plaintiffs' Motion for Leave; (14) Plaintiffs' First Amended Original Complaint; (15) Clerk's Entry of Default against Defendants; (16) Plaintiffs' Motion for Default Judgment; (17) Order Granting Plaintiffs' Motion for Default Judgment; (18) Memorandum Opinion and Order; and (19) Final Judgment.

The class-certification order appointed the Keys to represent a class defined as follows:

> All Texas residents who from June 11, 2003 through the present signed agreements with [LSRC] that included the following provision, or language substantially similar to the following provision: "This Agreement is for FULL SCOPE OF INSURANCE ESTIMATE AND UPGRADES and is subject to insurance company approval. By signing this agreement homeowner authorizes Lon Smith Roofing and Construction ("LSRC") to pursue homeowners['] best interest for all repairs at a price agreeable to the insurance company and LSRC. The final price agreed to between the insurance company and LSRC shall be the final contract price."

The order certified three claims for class treatment: "(a) Plaintiffs' declaratory judgment claim, (b) Plaintiffs' DTPA claim based on Section 17.50(a)(3) (Unconscionability), and (c) Plaintiffs' DTPA claim based on Section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code)."

The class-certification order set forth the trial court's findings of fact and conclusions of law that the Keys had met their burden of establishing all four requirements of rule 42(a) and three subdivisions of rule 42(b)—42(b)(3), 42(b)(2), and 42(b)(1)(A). The order certified the class alternatively under each of these subsections of rule 42(b); provided for notice and opt-out provisions for each of the classes certified alternatively under rule 42(b)(3), 42(b)(2), and 42(b)(1)(A); appointed class counsel; and set forth a trial plan.

## III. STANDARD OF REVIEW

We review a class-certification order for an abuse of discretion. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 696 (Tex. 2008); *Compaq Comput.*

12

*Corp. v. Lapray*, 135 S.W.3d 657, 671 (Tex. 2004). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding principles. *Bowden,* 247 S.W.3d at 696. We do not indulge every presumption in the trial court's favor, however, "as compliance with class action requirements must be demonstrated rather than presumed." *Id.* (citing *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 691 (Tex. 2002)). "Courts must perform a 'rigorous analysis' before ruling on class certification to determine whether all prerequisites have been met." *Bernal,* 22 S.W.3d at 435. Appellate courts have traditionally construed this directive to require trial courts to, among other things, look "'beyond the pleadings . . . as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id*. at 435 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)).

## IV. THE TRIAL COURT'S UNDERSTANDING OF THE SUBSTANTIVE LAW CONCERNING THE CERTIFIED CLAIMS

LSRC's first issue asserts that "the trial court misunderstood or failed to consider the law underlying the substantive claims at issue." LSRC complains that the trial court failed to properly analyze the substantive law concerning chapter 4102 of the insurance code, concerning the DTPA unconscionability claim, and concerning the DTPA violation-of-chapter-541-of-the-insurance-code claim and that the trial court's misunderstanding of the substantive law "resulted in the wrongful certification of a cause of action that does not exist." LSRC

13

argues in its brief and reply brief that the trial court "improperly refused[] to analyze the dispositive issue of whether any putative class member can state viable claims." In response, the Keys contend that these arguments are prohibited "merits-based attacks" disguised as "misunderstanding of the law" contentions.

Trial courts do not certify class actions based upon the probability of success on the merits, and in determining the certification issue, trial courts should not rule on the merits of the class members' claims. *See Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 404 (Tex. 2000). Nonetheless, to properly analyze certification issues, trial courts must go beyond the pleadings and must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues. *Bernal*, 22 S.W.3d at 435. Frequently, the rigorous analysis required under rule 42 will entail some overlap with the merits of the plaintiffs' underlying claim, which cannot be helped. *See Wal–Mart v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011). Accordingly, we review the merits of the Keys' claims below as necessary to address LSRC's contentions and to determine whether the trial court conducted a rigorous analysis in determining that the prerequisites of rule 42 were satisfied.[14]

---

[14]We agree with the Keys that many of LSRC's complaints on appeal are merits based. But faced with a decision between simply not addressing many of LSRC's complaints because they are merits based and addressing them at the risk of straying into the merits, we choose the latter. *See, e.g., Denton Cty. Elec.*

14

## A. Putative Class Members Can State Viable Claims

In part of its first issue, LSRC argues that the trial court "improperly refused[] to analyze the dispositive issue of whether any putative class member can state viable claims" by failing to conduct a hearing on LSRC's motion for summary judgment prior to the class-certification hearing.[15]   And the evidence presented to the trial court at the class-certification hearing—including the "Memorandum Opinion and Order and Findings of Fact," the judgment, and other documents from the *Reyelts* case—show that putative class members can state viable claims.  Magistrate Judge Cureton made a conclusion of law in the *Reyelts* case that the very same contractual provision that forms the basis of the Keys' claims here made LSRC's contract with the Reyeltses "[i]llegal, void[,] and unenforceable" and awarded DTPA damages to the Reyeltses based on facts substantially identical to those forming the basis of the Keys' claims and the

---

*Coop. v. Hackett*, 368 S.W.3d 765, 776 (Tex. App.—Fort Worth 2012, pet. denied).

[15]In its brief and reply brief, LSRC relies on *State Farm Mut. Auto Insurance Company v. Lopez*, 156 S.W.3d 550, 557 (Tex. 2004), for this proposition.  But in *Lopez*, "[i]n its certification order, the trial court did not identify the specific causes of action to be decided . . . , nor did it indicate how they would be tried or the substantive issues that would control their disposition." *Id.* Consequently, because the certification order in *Lopez* failed to identify any causes of action to be asserted by putative class members, the supreme court wrote, "If it is true, as State Farm contends, that no class member can state a viable claim, dispositive issues should be resolved by the trial court before certification is considered." *Id.*  Here, the trial court certified three specific causes of action to be decided, indicated how they would be tried, and set forth the substantive issues that would control their disposition.  Thus, *Lopez's* holding is inapplicable to the present facts.

claims certified in the class-certification order. And the order granting partial summary judgment for the plaintiffs in the *Spracklen* case was also presented to the trial court, reflecting that Judge Cosby had declared a similar provision included in a roofing-repair contract to be "illegal, void[,] and unenforceable." Indeed, at the hearing on a motion to compel, LSRC's counsel agreed that the form contract signed by Joe Key had in fact been declared illegal but argued that LSRC disagreed and did not think it was illegal. Given the evidence presented to the trial court, some of it by LSRC, concerning the *Reyelts* and *Spracklen* cases, we cannot agree with LSRC's contentions in its first issue that no putative class member can state a viable claim.[16] We overrule this portion of LSRC's first issue.

## B. The Declaratory Judgment Claim

LSRC also asserts under its first issue that the trial court "misunderstood the law related to the Keys' claim for declaratory relief." LSRC argues that "[a]ssuming *arguendo* that by using the Agreement LSRC acted as or held itself out as a public insurance adjuster, and that LSRC did not have the proper license

---

[16]According to LSRC's reply brief, the Keys contend that "a form contract simply equals class certification." LSRC points to *Supportkids, Inc. v. Morris* as defeating any form-contract-simply-equals-class-certification contention. 167 S.W.3d 422, 425 (Tex. App.—Houston [14th Dist.] 2005, pet. dism'd w.o.j.). We agree with LSRC that a form contract does not automatically equal class certification, but we do not read the Keys' contention so broadly, and we do not so hold. Instead, we examine the record to determine whether the Keys have satisfied their burden of establishing each of the class-certification elements. *See, e.g.*, *Peter G. Milne, P.C. v. Ryan*, 477 S.W.3d 888, 905 (Tex. App.—Texarkana 2015, no pet.).

16

or certificate, doing so could not render the contract illegal, void, or unenforceable, which is the entire underlying basis of the request for declaratory judgment." LSRC asserts that Texas Insurance Code section 4102.207 makes contracts with unlicensed public insurance adjusters merely voidable, not void, thereby purportedly defeating any claim for a declaratory judgment that the contracts are void.[17]

Under the Uniform Declaratory Judgments Act, a person interested under a written contract may have determined a question of construction or validity arising under the contract and obtain a declaration of rights. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West 2015). The law is well-settled that a contract to fulfill an obligation that cannot be performed without violating the law contravenes public policy and is void. *See Lewis v. Davis*, 145 Tex. 468, 471–72, 199 S.W.2d 146, 148–49 (1947); *see also Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 490–91 (Tex. 2016) (recognizing that when agreement cannot be performed without violating law or public policy, it is per se void). Courts will not enforce an illegal contract, particularly when the contract involves the doing of an act prohibited by statutes that were enacted for the protection of the public

---

[17]The Keys pleaded in the trial court and point out in their appellate brief that the LSRC contract they signed is also illegal because acting as a public insurance adjuster without a license—as the Keys contend that LSRC contracted to do—is a Class B misdemeanor offense. *See* Tex. Ins. Code Ann. § 4102.206(a) (providing that "[a] person commits an offense if the person violates this chapter. An offense under this subsection is a Class B misdemeanor"). LSRC does not address this ground of illegality in its brief.

health and welfare. *See, e.g.*, *Merry Homes, Inc. v. Luu*, 312 S.W.3d 938, 949–50 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (affirming judgment declaring lease void when lease required use of leased premises only for purposes prohibited by ordinance because of leased premises' proximity to school); *Swor v. Tapp Furniture Co.*, 146 S.W.3d 778, 783–84 (Tex. App.—Texarkana 2004, no pet.) (holding oral agreement for finder's fee void because "finder" was not licensed real-estate broker in violation of Real Estate License Act); *Peniche v. Aeromexico*, 580 S.W.2d 152, 155 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) (holding contract for driving services void and illegal because driver did not have chauffeur's license and, consequently, performance of contract would violate law requiring chauffeur's license, which was enacted for purpose of public safety). The rationale behind this rule—that courts will not enforce an illegal contract that involves the doing of an act prohibited by statutes enacted for the protection of the public's health and welfare—is not to protect or punish either party to the contract but to benefit and protect the public. *See, e.g.*, *Cruse v. O'Quinn*, 273 S.W.3d 766, 776 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *see also Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 210 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (explaining that the appropriate test when considering whether a contract violates public policy "is whether the tendency of the agreement is injurious to the public good, not whether its application in a particular case results in actual injury").

18

Because parties to a contract are presumed to be knowledgeable of the law, including public-safety laws, courts will generally leave parties to an illegal contract as they find them. *See Plumlee v. Paddock,* 832 S.W.2d 757, 759 (Tex. App.—Fort Worth 1992, writ denied). That is, courts are no more likely to aid one attempting to enforce such a contract than they are disposed in favor of the party who uses the illegality to avoid liability. *Id.* But an exception exists to this general common-law rule—that courts will not exercise equitable powers to aid parties to an illegal contract—when the parties are not in *pari delicto* and it is the least culpable party that is seeking relief. *See, e.g.*, *Oakes v. Guarantee Ins. Co.*, 573 S.W.2d 899, 902 (Tex. Civ. App.—Eastland 1978, writ ref'd n.r.e.) (citing *Am. Nat'l Ins. Co. v. Tabor*, 111 Tex. 155, 161, 230 S.W. 397, 400 (1921)). The exception is particularly applied when the illegality of the transaction depends on the existence of peculiar facts known to the defendant but unknown to the plaintiff and when the plaintiff had no intention of violating the law. *Id.* Thus, "where a person sues for services rendered another in an occupation which is illegal, unless the employer is duly licensed to carry it on, which he is not, such person may recover unless he knew that the employer had no license, for while he is bound to know that the employer must have a license to make the business legal, his mistake as to his having such license is a mistake of fact and not of law." *Id.*

Texas's regulation of the business of and licensing of public insurance adjusters is based on the policy of protecting the public. *See, e.g.*, Tex. Ins.

19

Code Ann. § 4102.004(1) (authorizing commissioner to adopt reasonable and necessary rules including qualifications of license holders necessary to protect public interest), § 4102.005 (requiring commissioner to adopt a code of ethics for public insurance adjusters), § 4102.057 (requiring, with certain exceptions, each applicant for a license as a public insurance adjuster to take and pass an examination), § 4102.103 (prohibiting licensed public insurance adjuster from utilizing contract for adjusting services not approved by commissioner), §§ 4102.104, .105, .106 (setting forth requirements concerning licensed public adjuster's commissions, proof of financial responsibility, and maintenance of place of business, respectively), § 4102.111 (requiring licensed public adjuster to hold funds received as claims proceeds in a fiduciary capacity).[18]  And, in responses to requests for admission, A-1 admitted that it is not and never has been a licensed public insurance adjuster.  Therefore, a declaratory-judgment action by the Keys and putative class members (as the least culpable parties who lacked knowledge of the fact that LSRC was not a licensed insurance adjuster) declaring any contracts in which LSRC agreed to engage in acts that constituted acting as or holding itself out as a public insurance adjuster (which is

---

[18]*See also* Tex. Dep't Ins. Comm'r Bulletin B-0017-12 (June 26, 2012); *id.* B-051-08.

20

illegal as violative of insurance code section 4102.051(a)) void and unenforceable by LSRC is viable under substantive law.[19]

LSRC argues that its contracts cannot be declared void per se because section 4102 makes them only voidable at the option of the insured. *See* Tex. Ins. Code Ann. § 4102.207(a). Contrary to LSRC's position, however, the fact that insurance code section 4102.207 provides that a contract for public insurance adjusting services to be performed by a person lacking a license "may be voided at the option of the insured" does not alter the void-per-se status of the contracts as to LSRC. Instead, as provided by the common law of contracts and as discussed above, such a contract violates public policy and is per se void as to LSRC. Section 4102.207 simply statutorily codifies the not-in-*pari-delicto* exception to the general rule that courts will not enforce contracts that are void for illegality so that "[a]ny contract for services regulated by [chapter 4102 of the insurance code] may be voided at the option of the insured." *See id.* That is, the legislature has statutorily made a contract that is void for illegality under the

---

[19]To the extent LSRC's first issue contends that its contract is a "legal contract [that] may be performed in an illegal manner," we cannot agree. Because LSRC does not possess a public insurance adjuster's license, any contract entered into by LSRC to perform such services is an illegal contract. *See* Tex. Ins. Code Ann. § 4102.051(a) (providing that "[a] person may not act as a public insurance adjuster in this state or hold himself or herself out to be a public insurance adjuster in this state unless the person holds a license issued by the commissioner"), § 4102.206(a) (providing that "[a] person commits an offense if the person violates this chapter"); *White*, 490 S.W.3d at 490–91; *Lewis*, 145 Tex. at 471–73, 199 S.W.2d at 148–49; *Merry Homes, Inc.*, 312 S.W.3d at 949–50; *Swor*, 146 S.W.3d at 783–84; *Peniche*, 580 S.W.2d at 155.

21

common law enforceable or voidable at the option of the least culpable party—the insured—when a person contracts with the insured to perform services as a public insurance adjuster but does not have a public insurance adjuster's license. *See Int'l Risk Control, LLC v. Seascape Owners Ass'n, Inc.*, 395 S.W.3d 821, 824–25 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (explaining that when licensed public insurance adjuster acts in violation of chapter 4102, adjuster's contract is not void—administrative penalties apply; but when unlicensed person acts as public insurance adjuster in violation of chapter 4102, contract is void at option of insured under section 4102.207).[20]  We overrule the portions of LSRC's first issue claiming that the trial court misunderstood the law related to the Keys' claim for declaratory relief because even if LSRC acted as or held itself out as a public insurance adjuster and did not have the proper license, "doing so could not render the contract illegal, void, or unenforceable, which is the entire underlying basis of the request for declaratory judgment."

LSRC also claims under its first issue that the trial court misunderstood the law regarding public insurance adjusting because the Keys did not actually plead

---

[20]*See also* Brief of Amici Curiae National Association of Public Insurance Adjuster and Texas Association of Public Insurance Adjusters in Support of Appellees at 5–16 (explaining the public policy behind enforcing the licensing requirement for public insurance adjusters and stating that "[a]llowing unlicensed intermediaries between the homeowner and an insurance company would wreak havoc on the licensed and regulated public insurance adjuster profession" and therefore "would allow contractors to take advantage of homeowners – particularly in the face of a catastrophic natural disaster, when they are most vulnerable – in situations where the contractors' financial interests obviously conflict with those of the homeowner").

22

that LSRC *acted* as a public insurance adjuster but merely that LSRC *held itself out* as a public insurance adjuster and promised to act—without actually acting—as a public insurance adjuster. This contention by LSRC is a distinction without a difference; section 4102.207 gives an insured the option to void a contract entered into with a person "who is in violation of Section 4102.051." *See* Tex. Ins. Code Ann. § 4102.207(a). And section 4201.051 prohibits a person both from acting as a public insurance adjuster and from "hold[ing] himself or herself out to be a public insurance adjuster" if the person does not have a license. *See id.* §§ 4102.051(a), .207(a). LSRC did not have a public insurance adjuster license, so it was prohibited from both acting as and holding itself out as a public insurance adjuster; either type of conduct violates section 4102.051. We overrule this portion of LSRC's first issue.

Also under its first issue, LSRC argues that, in fact, it never acted as or held itself out as a public insurance adjuster. LSRC points to an Insurance Commissioner Bulletin authorizing roofing companies to "discuss the amount of damage to the consumer's home, the appropriate replacement, and reasonable cost of replacement with the insurance company."[21] The same Bulletin, however, provides that a roofing company may not "advocate on behalf of a consumer" or "discuss insurance policy coverages and exclusions." *See* Tex. Dep't Ins.

---

[21] *See* Tex. Dep't Ins. Comm'r Bulletin B-0017-12.

23

Comm'r Bulletin B-0017-12. As set forth above, the LSRC Acceptance and Agreement provision provided:

> This Agreement is for FULL SCOPE OF INSURANCE ESTIMATE AND UPGRADES and is subject to insurance company approval. By signing this agreement homeowner authorizes Lon Smith Roofing and Construction ("LSRC") to pursue homeowner[s'] best interest for all repairs, at a price agreeable to the insurance company and LSRC. The final price agreed to between the insurance company and LSRC shall be the final contract price.

To the extent LSRC asserts that it never acted or held itself out as a public insurance adjuster because LSRC merely agreed to "discuss the amount of damage to the consumer's home, the appropriate replacement, and reasonable cost of replacement with the insurance company" but did not agree to "advocate on behalf of a consumer" or "discuss insurance policy coverages and exclusions[,]" we cannot agree. By the express terms of the contractual provision set forth above, LSRC agreed to "pursue homeowners['] best interest" and to reach an agreement with the insurance company for the final roofing contract price—"[t]he final price agreed to between the insurance company and LSRC shall be the final contract price." By contracting to "pursue homeowners['] best interest" and to reach a settlement with the Keys' insurance company, LSRC explicitly agreed to "advocate on behalf of a consumer [the Keys]"—which is conduct prohibited by the same Insurance Commission Bulletin that LSRC claims authorized its conduct. *See generally* Tex. Ins. Code Ann. § 4102.001(3) (defining "public insurance adjuster" as including a "person" who acts on behalf of

24

an insured in negotiating settlement of a claim). We overrule this portion of LSRC's first issue.

LSRC also argues that the trial court misunderstood the law of collateral estoppel and res judicata concerning Magistrate Judge Cureton's holdings in *Reyelts*.[22] The trial court's class-certification order made no findings regarding collateral estoppel. The Keys argue on appeal that they do not rely on collateral estoppel to establish their class claims; the Keys assert that "[t]he class-wide claims are rock solid and stand on their own merit." Accordingly, we review the propriety of the class-certification order without applying collateral estoppel or any benefits from application of that doctrine to the alleged class claims. We overrule this part of LSRC's first issue; neither the Keys, the trial court, nor the class-certification order purport to apply the doctrine of collateral estoppel to support class certification.

### C. The DTPA Section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code) Claim

Also within its first issue, LSRC complains that the trial court "did not vigorously analyze the DTPA section 17.50(a)(4) claim." LSRC asserts that a violation of chapter 4102 does not constitute a violation of chapter 541 and therefore is not actionable under DTPA section 17.50(a)(4).

The Keys pleaded the following in their petition for class certification:

---

[22]LSRC makes this statement in a heading in its briefing. The argument portion of LSRC's brief addresses collateral estoppel only. We address that contention.

25

Of critical importance to Plaintiffs, [LSRC]'s form contracts, including the "Agreement" executed by Plaintiffs, expressly provided that [LSRC] would act on Plaintiffs' behalf in negotiating for and effecting the settlement of Plaintiffs' claim with their insurance carrier and that [LSRC] would do so with Plaintiffs' "best interest" in view.

. . . .

What Plaintiffs did not know and what [LSRC] never told them was that at the time [LSRC] had Plaintiffs sign the "Agreement," [LSRC] could not legally provide the insurance claims negotiation services that it was promising because [LSRC] lacked the requisite license to provide such services. As Lon Smith was well aware, the Texas Insurance Code has provided since 2003 that "a person may not act as a public insurance adjuster in this state or hold himself or herself out to be a public insurance adjuster in this state *unless the person holds a license of certificate issued by the commissioner under Section 4102.053, 4102.054, or 4102.069*." *See* Tex. Ins. Code § 4102.051(a) (Emphasis added).

. . . .

46.    [LSRC]'s conduct, as outlined above, violated multiple provisions of the DTPA, including, but not necessarily limited to, the following:

. . . .

h.    Section 17.50(a)(4), by use and employment of an agreement that was and is illegal and violative of Chapter 4102 of the Texas Insurance Code, which constituted an act or practice in violation of Chapter 541 of the insurance code.[23]

Looking beyond the pleadings at the substantive law, DTPA section 17.50(a)(4) authorizes a consumer to maintain an action for restitution damages

---

[23]LSRC did not specially except to the Keys' pleadings concerning the DTPA section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code) claim.

when a person's use or employment of an act or practice in violation of chapter 541 of the insurance code is a producing cause of such damages. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(4), (b)(3); *United Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F. Supp. 3d 584, 601–02 (S.D. Tex.) (explaining that "chapter 541, subchapter B, of the Texas Insurance Code, . . . provides a cause of action to any 'person' injured by another's deceptive acts or practices in the business of insurance"), *aff'd,* 624 F. App'x 225 (5th Cir. 2015).

The purpose of chapter 541 is to regulate trade practices in the business of insurance by defining practices that are unfair or deceptive and prohibiting those practices. *See* Tex. Ins. Code Ann. § 541.001 (West 2009). Section 541.008 provides that "[t]his chapter shall be liberally construed and applied to promote the underlying purposes as provided by Section 541.001." *Id.* § 541.008 (West 2009). Subchapter B of chapter 541, specifically section 541.051(1)(A) and (B), provide that it is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to make an estimate that misrepresents the terms of a policy or the benefits of a policy and that it is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to make a statement misrepresenting the benefits of a policy. *Id.* § 541.051(1)(A), (B) (West 2009).

The conduct of a person acting as an insurance adjuster may violate chapter 541 of the insurance code. *See id.* § 541.002 (West 2009) (defining "person" as including an adjuster); *Gasch v. Hartford Accident & Indem. Co.*, 491

27

F.3d 278, 283 (5th Cir. 2007); *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998); *see also* 28 Tex. Admin. Code Ann. § 21.1 (Tex. Dep't of Ins., Deceptive Acts or Practices of Insurers, Agents, and Connected Persons) (further defining those persons who may commit acts violating the insurance code as including "other persons" in their conduct of the business of insurance or in connection therewith, whether done directly or indirectly); *Exch. Servs., Inc. v. Seneca Ins. Co.*, No. 3:15-CV-01873-M, 2015 WL 6163383, at *4 (N.D. Tex. Oct. 16, 2015) (mem. op. & order) (collecting Fifth Circuit cases recognizing that adjusters may be individually liable under chapter 541 of the insurance code); *Centro Cristiano Cosecha Final, Inc. v. Ohio Cas. Ins. Co.*, No. H-10-1846, 2011 WL 240335, at *5 & n.8 (S.D. Tex. Jan. 20, 2011) (op. & order) (explaining that "Texas law recognizes that unfair insurance settlement conduct under the Texas Insurance Code may be asserted against individual[,] independent[,] and corporate adjusters").

Because LSRC contractually promised that it would pursue the Keys' best interest in negotiating an agreement with the Keys' insurance company and that LSRC's negotiated contract price would be agreed to by the Keys' insurance company—acts that under chapter 4102 of the insurance code LSRC could perform only if it were a licensed insurance adjuster—LSRC's contract misrepresenting that it could and would perform these acts in connection with the Keys' homeowners' insurance claim violates chapter 4102 of the insurance code and constitutes an unfair or deceptive act or practice in the business of insurance

28

under chapter 541 of the insurance code. *See, e.g.*, Tex. Ins. Code Ann. §§ 541.001–.454 (West 2009 & Supp. 2016); *Reyelts*, 968 F. Supp. 2d at 844 ("The Lon Smith Defendants' use and employment of an agreement that was and is illegal and violative of Chapter 4102 of the Texas Insurance Code constituted an act or practice in violation of Chapter 541 of the Texas Insurance Code and, thus, a violation of section 17.50(a)(4) of the DTPA.").

We overrule the portion of LSRC's first issue complaining that the trial court misunderstood the law concerning the Keys' DTPA section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code) claim.

## D. The DTPA Section 17.50(a)(3) (Unconscionability) Claim

In portions of LSRC's first and second issues, LSRC complains that "[i]ndividual issues would predominate with respect to the class's unconscionability claim pursuant to DTPA section 17.50(a)(3)" and that the DTPA unconscionability claim lacks rule 42(a)(2) commonality. LSRC argues that "unconscionability claims involve highly individualized inquiries that are not appropriate for resolution by a class action."

The DTPA provides that a consumer may maintain an action in which an unconscionable action or course of action by any person constitutes a producing cause of economic damages. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(3). The DTPA defines "[u]nconscionable action or course of action" as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair

29

degree." *Id.* § 17.45(5) (West 2011). The term "gross" should be given its ordinary meaning, and therefore, the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Dwight's Discount Vacuum Cleaner City, Inc. v. Scott Fetzer Co.*, 860 F.2d 646, 650 (5th Cir. 1988) (citing *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985)), *cert. denied,* 490 U.S. 1108 (1989); *see also Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998). Unconscionability is an objective standard for which scienter is irrelevant. *See Koonce*, 700 S.W.2d at 583 ("This should be determined by examining the entire transaction and not by inquiring whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference.").

The Keys assert that that "[n]o . . . factual circumstance can rescue a contract that expressly violates Texas public policy from being found unconscionable." Accordingly, the Keys argue that because the legislature determines public policy through the statutes it passes[24] and because LSRC's form contract violates a statute—various provisions of insurance code chapter 4102[25]—LSRC's contract therefore violates public policy set by the legislature (via insurance code chapter 4102) and is unconscionable. This is true. *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006) (holding

---

[24]*See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008) ("The Legislature determines public policy through the statutes it passes.").

[25]The Keys cite to Texas Insurance Code sections 4102.001(3), 4102.051, and 4102.158.

30

provision in attorney's fee contract requiring client that terminated contract to immediately pay attorney fee equal to present value of attorney's interest in case was inconsistent with public policy and unconscionable); *Sec. Serv. Fed. Credit Union v. Sanders*, 264 S.W.3d 292, 297 (Tex. App.—San Antonio 2008, no pet.) (holding provision in arbitration agreement requiring arbitrator to assess attorney's fees and costs against consumer if consumer were unsuccessful in DTPA action—without finding of groundlessness required by DTPA statute—was inconsistent with public policy of DTPA and therefore substantively and procedurally unconscionable); *see also* Tex. Bus. & Com. Code Ann. § 2.302 (West 2009) (discussing unconscionable contracts under the Uniform Commercial Code). But the fact that a contract may be substantively or procedurally unconscionable as violative of public policy does not automatically shoehorn a party's conduct in entering into the contract with a consumer into the DTPA's definition of "unconscionable action or course of action." *See* Tex. Bus. & Com. Code Ann. § 17.45(5) (defining "unconscionable action or course of action" as meaning "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree"). Case law uniformly holds to the contrary; the unconscionable-act-or-course-of-action element of a DTPA section 17.50 unconscionability claim requires proof of each consumer's knowledge, ability, experience, or capacity. *Id.* § 17.50. A DTPA section 17.50(a)(3) unconscionability claim requires a consumer (here the Keys and each class

31

member) to show that the defendant's acts (the acts of LSRC) took advantage of the consumer's lack of knowledge and that the resulting unfairness was glaringly noticeable, flagrant, complete, and unmitigated. *See, e.g.*, *Morris*, 981 S.W.2d at 677; *Koonce*, 700 S.W.2d at 583. Because the unconscionable-act-or-course-of-action element of a DTPA section 17.50 unconscionability claim requires proof of each consumer's knowledge, ability, experience, or capacity, courts generally refuse to certify DTPA unconscionability claims for class treatment. *See, e.g.*, *Ryan*, 477 S.W.3d at 913–14 (reversing class certification of DTPA unconscionability claim because "determining whether Hicks'[s] actions were unconscionable requires evaluation of each member's individual circumstances"); *Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 105–06 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (affirming denial of class certification of DTPA unconscionability claim because individualized inquiry into each buyer's circumstances is required to answer the question "whether the charging of a fee under the designations such as 'NACC,' 'Consumer Benefits & Services (ECBP),' 'NADW,' 'Intelesys,' and/or other similar designations is an unconscionable . . . act"); *Peltier Enter., Inc. v. Hilton*, 51 S.W.3d 616, 623–24 (Tex. App.—Tyler 2000, pet. denied) (reversing class certification of DTPA unconscionability claim because "[t]here must be a showing of what the consumer could have or would have done if he had known about the information . . . there would need to be some showing of each customer's 'knowledge, ability, experience, or capacity'"); *see also Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014)

32

(holding that even under the UCC—as opposed to the DTPA here—court is to make a "highly fact-specific inquiry into the circumstances of the bargain, such as the commercial atmosphere in which the agreement was made, the alternatives available to the parties at the time and their ability to bargain, any illegality or public policy concerns, and the agreement's oppressive or shocking nature" when determining unconscionability).

Here, as in *Ryan*, *Wall*, and *Peltier*, individual issues concerning each class-member consumer's knowledge, ability, experience, or capacity is required to establish the unconscionable-act-or-course-of-action element of a DTPA unconscionability claim.[26]  *Ryan*, 477 S.W.3d at 913–14; *Wall*, 176 S.W.3d at 105–06; *Peltier*, 51 S.W.3d at 623–24.  Because this primary element of a DTPA unconscionability claim requires individualized proof concerning each class member, we hold that the trial court failed to conduct a rigorous analysis of the substantive law surrounding a DTPA unconscionability claim—specifically the unconscionable-act-or-course-of-action element.  Because the unconscionable-

_____

[26]Unlike the DTPA violation-of-chapter-541-of-the-insurance-code claim in *Reyelts*, which was premised on the use of contractual language identical to that used here, the DTPA unconscionability claim in *Reyelts* was premised on specific facts relating to Beatriz Reyelts's lack of knowledge, ability, and experience concerning roof damage and insurance claims.  *See* 968 F. Supp. 2d at 839–40 (stating that "Beatriz is a 69-year-old, retired first grade school teacher who does not possess any special knowledge or expertise regarding assessing roof damage caused by hail or estimating the materials, services, and costs needed to repair such damage" and that "Beatriz was not experienced or sophisticated in terms of knowing how to secure Farmers'[s] agreement to pay the Lon Smith Defendants for the roof repairs that the Lon Smith Defendants had said were necessary").

act-or-course-of-action element of DTPA unconscionability claims is not subject to class-wide proof here, we hold that the trial court abused its discretion by certifying this claim for class treatment. We sustain the portion of LSRC's second issue complaining that the DTPA unconscionability claims were improperly certified because they "involve highly individualized inquiries that are not appropriate for resolution by a class action."[27]

## V. THE CHALLENGED REQUISITES OF RULE 42(a) ARE SATISFIED

In its fourth issue, LSRC complains that the Keys failed to satisfy their burden of proving rule 42(a)'s requirements of numerosity, typicality, and adequacy of representation.

### A. Numerosity

LSRC complains that the Keys failed to establish numerosity because LSRC's contracts—with the approximately 3,000 persons falling within the certification order's class definition—were voidable, not void, and because the Keys failed to prove how many of those persons pursued actions to void the contract or had homeowners' insurance.

Numerosity is not based on numbers alone; rather, the test is whether joinder of all members is practicable in view of the size of the class and includes such factors as judicial economy, the nature of the action, geographical location

---

[27]Because we hold that the class DTPA unconscionability claim fails on predominance grounds, we need not address LSRC's commonality challenge to this claim.

34

of class members, and the likelihood that class members would be unable to prosecute individual lawsuits. *Graebel/Hous. Movers, Inc. v. Chastain*, 26 S.W.3d 24, 29, 32 (Tex. App.—Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (citing *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 653 (Tex. App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.)); *Rainbow Grp., Ltd. v. Johnson*, 990 S.W.2d 351, 357 (Tex. App.—Austin 1999, pet. dism'd w.o.j.).

The record before us confirms that the Keys met their burden to establish numerosity. LSRC conceded in the trial court that it had maintained copies of all contracts signed by consumers with LSRC. And LSRC entered a signed stipulation in the trial court stating that "A-1 stipulates that at least 500 customers have entered into each standard form of residential roofing contract that A-1 has utilized in its business between 2010 and the present." The Keys attached to their request for class certification a copy of each of the six form contracts utilized by LSRC between 2010 and the present, and each of the six contracts contains the identical Acceptance and Agreement provision contained in the Keys' contract. If each of the six residential roofing contracts used sequentially by LSRC since 2010 was signed by at least 500 customers, 500 customers per six contracts equals a pool of at least 3,000 customers.

The certification order defines the class as limited to Texas residents who from June 2003 to the present signed one of the six agreements with LSRC containing the Acceptance and Agreement provision, constituting in excess of 3,000 putative class members. After examining the numerosity factors set forth

35

above—joinder of all 3,000 plus class members is not practicable in view of the size of the class, judicial economy is served by a class action, the nature of the declaratory-judgment and the DTPA violation-of-chapter-541-of-the-insurance-code claims makes them amenable to class action litigation, the geographical location of the class members is Texas, and the likelihood that class members would be unable to prosecute individual lawsuits because most do not know of the existence of the causes of action accruing to them as a result of LSRC's unlicensed-public-adjuster status—all weigh in favor of class certification. The Keys satisfied rule 42(a)'s numerosity requirement. *See, e.g.*, *Durrett v. John Deere Co.*, 150 F.R.D. 555, 557 (N.D. Tex. 1993) ("Because the estimate of potential class members ranges as high as 14,000, the Court has no difficulty concluding that a class certified in this cause would satisfy the numerosity requirement"); *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (recognizing that in determining numerosity, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim"); *Phillips v. J. Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. 1981) (recognizing that in determining numerosity, "[t]he proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors"), *cert. denied*, 456 U.S. 960 (1982).

## B. Typicality

The test for typicality is not demanding. *See, e.g.*, *Ryan*, 477 S.W.3d at 908. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Bernal,* 22 S.W.3d at 433. A class representative must be part of the class and must possess the same interest and suffer the same injury as the class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370 (1982). Although the named representatives need not suffer precisely the same injury as the other class members, there must be a nexus between the injury suffered by the representatives and the injury suffered by the other members of the class. *Spera v. Fleming, Hovenkamp & Grayson, P.C.*, 4 S.W.3d 805, 812 (Tex. App.— Houston [14th Dist.] 1999, no pet.). To be typical, the class representatives' claims must also be based on the same legal theory. *Id.*

LSRC argues that the Keys' claims are not typical of the class because (1) the contracts are not illegal; (2) LSRC may elect to enforce an arbitration clause in the contracts; (3) Stacci did not sign the contract with LSRC; (4) many of the LSRC contracts had substantially similar clauses, not identical clauses; (5) the Keys failed to prove how many class members had homeowners' insurance; and (6) mental anguish damages were not sought on behalf of the class members under the DTPA claims. We address each of these contentions by LSRC. For the reasons set forth below, we determine LSRC's challenges to the trial court's typicality finding to be without merit.

37

First, the contracts are illegal, as set forth in section IV.B. above. Second, LSRC failed to prove that the contracts contain an arbitration clause.[28] Third, the Keys pleaded that Joe's signature bound Stacci, and regardless of whether Stacci signed the contract with LSRC, under Texas law, she is presumed responsible for community debt incurred during the marriage and thus possesses status as a plaintiff identical to Joe. *See, e.g.*, *Richardson v. Richardson*, 424 S.W.3d 691, 697 (Tex. App.—El Paso 2014, no pet.) ("The community property presumption applies to both assets and liabilities. Therefore, there is a presumption that debt acquired by either spouse during marriage was procured on the basis of community credit.") (internal citations omitted). Fourth, as testified to by A-1's corporate representative David Cox in his deposition

---

[28]As explained in the Keys' brief on pages 25–26 and borne out by the record:

> [LSRC]'s frivolous argument that an arbitration clause undermines typicality fails for several reasons. First, the record fails to support [LSRC]'s suggestion that an arbitration clause even existed in any form contract. [LSRC] produced six form contracts—five of those form contracts were one page and did not contain any arbitration clause. [2 CR 455–60]. The sixth form contract was followed by two extra terms and conditions pages not included in the other five form contracts—one of those terms and conditions pages contained an arbitration clause, and the other did not. [2 CR 461–62]. [LSRC]'s counsel admitted on the record that both of those terms and conditions pages could not be part of the same form contract. [2 CR 416 ("So only one of those could be part of the [sixth] contract.")]. [A-1]'s corporate representative agreed it would be "impossible" for both terms and conditions sheets to be a part of the sixth form contract. [*Id.*]. Neither [LSRC], nor [their] counsel, however, ever indicated that the terms and conditions page containing the arbitration clause was part of the sixth form contract. [*Id.*].

38

attached to the Keys' motion for class certification and as reflected in the six actual form contracts utilized by LSRC and attached to the Keys' motion for class certification, all of the contracts contain the exact same Acceptance and Agreement provision, despite LSRC's complaint concerning the trial court's use of the phrase "substantially similar" in the certification order.[29]  Fifth, whether or not a homeowner had insurance does not change the fact that the LSRC contract is void as to A-1, and Cox conceded that the vast majority of A-1's roofing work involved insurance-backed customer agreements.  Sixth, a representative plaintiff is allowed to forgo "person-specific" de minimis damage claims to achieve class certification; when a few class members' person-specific injuries prove to be substantial, they may opt out and litigate independently.  *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006).  None of LSRC's contentions preclude the trial court's finding of typicality.

The record before us establishes that the Keys met their burden of establishing typicality.

### C.  Adequacy of Representation

The adequacy-of-representation requirement "tend[s] to merge" with the commonality and typicality requirements that "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that

---

[29]LSRC raises this same complaint in its fifth issue.  We overrule this portion of LSRC's fifth issue.

39

the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n.13, 102 S. Ct. at 2370 n.13. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S. Ct. 1891, 1896 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S. Ct. 2925, 2930 (1974)). In determining the adequacy requirement, the trial court must inquire into the zeal and competence of class counsel and into the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees. *Rainbow Grp., Ltd.,* 990 S.W.2d at 357. The primary issue to be considered is whether conflict or antagonism exists between the interests of the representatives and those of the remainder of the class. *Id.* However, only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. *Id.*

The Keys met their burden of establishing that they will fairly and adequately protect the interests of the class. The Keys proved that they share with other class members the same declaratory-judgment and DTPA (Violation of Chapter 541 of the Texas Insurance Code) claims based on identical contractual provisions set forth in a contract with LSRC. No antagonistic interests exist among class members nor has LSRC asserted any specific antagonistic interests between class members. *See Farmers Ins. Exch. v. Leonard,* 125 S.W.3d 55, 66 (Tex. App.—Austin 2003, pet. denied); *see also Adams v. Reagan,* 791 S.W.2d

40

284, 291 (Tex. App.—Fort Worth 1990, no writ) (recognizing that "[t]he primary issue to be considered in whether 'the representative parties will fairly and adequately protect the interest of the class' is a determination of whether any antagonism exists between the interests of the plaintiffs and those of the remainder of the class").

The Keys have retained counsel with class-action experience in other cases, which was acknowledged by LSRC during the class-certification hearing. The Keys' retained counsel appealed the *Riemer* case to the Texas Supreme Court along with the same counsel who successfully prosecuted the same causes of action against LSRC in the *Reyelts* case*. See generally Riemer v. State*, 392 S.W.3d 635, 641 (Tex. 2013) (reversing trial court and court of appeals for denying class certification based on lack of rule 42(a)(4) adequacy and noting, "to the extent Mr. Johnson's relatives disagree with the propriety of the litigation, the class representative, or the class representative's counsel, they may utilize Rule 42's procedures for opting out of the class"). The record reflects that the Keys have a sufficient interest in, and nexus with, the class to insure vigorous and tenacious prosecution—through the experienced class counsel they retained—of the class declaratory-judgment and the DTPA violation-of-chapter-541-of-the-insurance-code claims. *See, e.g., Durrett*, 150 F.R.D. at 558.

To the extent LSRC complains that the Keys are not adequate class representatives because of their "willingness to [forgo] mental anguish damages" on behalf of the class, the Texas Supreme Court has rejected this contention.

41

*See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 697 (Tex. 2008) (rejecting contention that class representative's abandonment of some claims to achieve commonality makes the representative inadequate because such a holding would require class representatives to assert every possible claim for each individual class member, which would almost always defeat typicality and predominance requirements). As set forth below, in connection with the superiority analysis, the lack of individual lawsuits against LSRC and the likelihood that any insureds suffering mental anguish damages, like the Reyeltses and the Keys, would have already pursued individual lawsuits supports not only the trial court's finding of superiority but also of adequacy of representation.

We overrule LSRC's fourth issue and conclude that the Keys met their burden of establishing rule 42(a)'s requirements of numerosity, typicality, and adequacy of representation.

## VI. SATISFACTION OF RULE 42(b)

The trial court found that the Keys had satisfied their burden to prove certification of the class claims under rule 42(b)(3), (b)(2), and (b)(1)(A) and certified the class claims alternatively under these subsections of rule 42(b). In its second issue, LSRC challenges the trial court's certification of the class under rule 42(b)(3), specifically attacking predominance and superiority.[30] In its third

---

[30]LSRC's second issue primarily asserts that class certification of the DTPA section 17.50(a)(3) (Unconscionability) claim runs afoul of rule 42(b)(3)'s

issue, LSRC challenges the trial court's certification of the class under rule 42(b)(2) and 42(b)(1).

## A. The Requirements of Rule 42(b)(3) Are Satisfied

To certify a class under rule 42(b)(3), the court must find that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Tex. R. Civ. P. 42(b)(3); *see, e.g.*, *Lapray*, 135 S.W.3d at 663.

## 1. Predominance

To establish predominance, a plaintiff seeking class certification is not required to prove that each and every element of her claim is susceptible to class-wide proof. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 468, 133 S. Ct. 1184, 1196 (2013). Rule 42(b)(3) certification is proper if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Tex. R. Civ. P. 42(b)(3). "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir.

predominance and superiority requirements. Because we have held that the trial court abused its discretion by certifying the DTPA section 17.50(a)(3) (Unconscionability) claim, we need not address the portions of LSRC's second issue raising complaints regarding certification of this claim. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to disposition of appeal).

1986)), *cert. denied*, 528 U.S. 1159 (2000). As explained by Circuit Judge Richard A. Posner, predominance is not "determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance," but "predominance requires a qualitative assessment too; it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014). What is required is that common questions "*predominate* over any questions affecting only individual [class] members." *Amgen Inc.*, 133 S. Ct. at 1196 (quoting Fed. R. Civ. P. 23(b)(3)) (alteration and emphasis in the original). The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 2249 (1997).

In making a predominance determination, courts must give careful scrutiny to the relation between common and individual questions in a case. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196–97 (5th ed. 2012)) (internal quotation marks omitted). The predominance inquiry "asks whether the common, aggregation-enabling[] issues in the case are more

44

prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, *supra*, at §4:49, pp 195–96). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." 7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1778, pp. 123–24 (3d ed. 2005) (footnotes omitted).

Determining whether legal issues common to the class predominate also requires that the court inquire how the case will be tried. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003). "This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*

LSRC argues that predominance is not satisfied for two reasons: because LSRC will assert a statute-of-limitations defense against some proposed class members that will require individual factual inquiries concerning each plaintiff and because "the calculation of damages requires individualized inquiry." We address these two challenges by LSRC to rule 42(b)(3)'s predominance requirement.

45

### a. LSRC's Statute-of-Limitations Defense Is a Common Issue with Common Answers

LSRC makes a one-sentence attack on predominance based on LSRC's statute-of-limitations defense:

> The Keys also failed to articulate how individual issues can be addressed fairly to allow LSRC the opportunity to adequately and vigorously present their viable claims or defenses, such as their statute-of-limitations defense, or their right to an offset for the value of the roof installed on each potential class member's home, and this failure is fatal to class certification.

LSRC's statute-of-limitations argument is addressed here; its damages arguments regarding predominance are addressed in subsection VI.A.1.b.

The predominance of individual issues necessary to decide an affirmative defense, such as a statute-of-limitations defense, may preclude class certification. *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir.), 543 U.S. 870 (2004); *see O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) (explaining that when a statute-of-limitations defense "raises substantial individual questions that vary among class members," such questions may defeat predominance); *see also* Tex. R. Civ. P. 94 (listing limitations as an affirmative defense). As recognized by the Fifth Circuit, however, "[t]hough individual class members whose claims are shown to fall outside the relevant statute of limitations are barred from recovery, this does not establish that individual issues predominate[.]" *Monumental Life Ins. Co.*, 365 F.3d at 420;[31]

---

[31]In *Monumental Life Ins. Co.*, a class of plaintiffs alleged that the defendant had engaged in a "common scheme of fraudulent concealment," but

*Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975) (explaining that for purposes of class certification, "[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones"), 426 U.S. 936 (1976); *see also Castro v. Collecto, Inc.*, 256 F.R.D. 534, 542–43 (W.D. Tex. 2009) (certifying class over defendants' assertions that their statute-of-limitations defense would require "mini-trials" as to each class member to determine whether that member's claim was time-barred).  In particular, lower courts have found that predominance is not defeated when the doctrines used by plaintiffs for tolling a statute of limitations involve proof common to the defendants.  *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 485–86 (C.D. Cal. 2012).  That is, even as concerning the affirmative defense of statute of limitations, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551.

Limitations defenses generally present common questions, rather than individual ones, because a limitations defense's merits rest on two facts:  (1) the

---

the district court denied class certification because "individualized hearings [were] necessary to determine expiration of the statute of limitations for particular sets of [insurance] policies."  *Id.* at 420–21.  The Fifth Circuit held that this was insufficient to preclude class certification in light of the "efficiency aims of rule 23."  *Id.*  Thus, the Fifth Circuit reversed the trial court's denial of class certification that was based on lack of predominance concerning the statute-of-limitations affirmative defense.  *Id.*

date on which the statute of limitations accrued and (2) the date on which the action was filed. *See, e.g.*, *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 229 n.33 (D.N.M. 2016). Fact (2) is a common issue in virtually every class action because the entire class gets credit for the filing date of the class-action petition. *Id.* Fact (1) may or may not be truly common; it may be, if, for example, the discovery rule delays accrual of a statute of limitations until the cause of action is discovered and all class members' causes of action are discovered at the same time, or if a single act by the defendant breached contracts with all class members at once. *Id.*

Here, the Keys' arguments to rebut LSRC's limitations defense point to common questions of law that may be resolved on a class-wide basis. The Keys explain that they

> sought class certification on September 30, 2014. Contract claims carry a four-year limitations period, while DTPA claims carry a two-year limitation[s] period. Thus, no limitations issues exist for contracts entered after September 30, 2010 and September 30, 2012, respectively, for those claims. Because the class is limited to Texas residents, all these limitations periods will apply equally to all class members.

> . . . .

> Here, there is no evidence that any of the class members were unaware that they signed the form contracts at issue and thereby failed to discover the facts underlying their claim. Rather, the predominant question for limitations is a purely legal one; that is, when does the period expire for recognizing a contract is void? [Citations omitted.]

48

Based on this analysis, facts (1) and (2) relevant to LSRC's limitations defense are common, class-wide issues subject to common, class-wide answers. Here, fact (2)—the date on which the action was filed—is the same for all class members: September 30, 2014. Fact (1)—the date on which the statute of limitations accrued—is likewise the same for all class members subject to the affirmative defense of limitations.[32] That is, fact (1) will be decided as to the declaratory-judgment-action class members who signed contracts with LSRC prior to September 30, 2010, and as to the DTPA violation-of-chapter-541-of-the-insurance-code-claim class members who signed contracts with LSRC prior to September 30, 2012, on a class-wide basis. The trial court will determine the legal issue of whether or not the time period for seeking a declaratory judgment declaring the LSRC contract void as to LSRC expired and the legal issue of whether or not the time period for bringing a DTPA (Violation of Chapter 541 of the Texas Insurance Code) claim expired, and those legal determinations will apply uniformly to all class members whose claims are subject to LSRC's limitations defense. Consequently, a class-wide proceeding here will generate common answers to LSRC's statute-of-limitations defense that will drive the resolution of this litigation. *See Tait*, 289 F.R.D. at 486 (upholding class certification as satisfying rule 23(b)(3) predominance requirement because

_____

[32]Suit was filed timely as to class members signing contracts with LSRC after these dates; hence these class members are not subject to LSRC's limitations defense.

49

plaintiffs' arguments to rebut defendant's statute-of-limitations defense raised common questions of law susceptible to common proof and common answers). Accordingly, we overrule the one-sentence contention set forth under LSRC's second issue that challenges predominance as applied to its statute-of-limitations defense. *See, e.g.*, *Monumental Life Ins. Co.*, 365 F.3d at 420; *Williams*, 529 F.2d at 1388; *Castro, Inc.*, 256 F.R.D. at 542–43.

### b. Calculation of Damages Will Depend on Objective Criteria—LSRC's Records—and Will Not Require Testimony

Class certification may be inappropriate when individualized damage determinations predominate over common issues. *See O'Sullivan*, 319 F.3d at 744–45 ("Where the plaintiffs' damages claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried."). But generally, individualized damage calculations will not preclude a finding of predominance, *see Tyson Foods, Inc.*, 136 S. Ct. at 1045, so long as individual damages may be readily calculated from a defendant's records. *See, e.g.*, *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (allowing class certification when individualized damages could be readily calculated from defendant's computerized payroll records); *Arreola v. Godinez,* 546 F.3d 788, 801 (7th Cir. 2008) (recognizing that "the need for individual damages determinations does not, in and of itself, require denial of [a] motion for certification" under rule 23(b)(3)); *Allapattah Servs. v. Exxon Corp.,* 333 F.3d

50

1248, 1261 (11th Cir. 2003) ("[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate[.]"), *aff'd in part and rev'd in part on other grounds,* 545 U.S. 546 (2005).

The Keys pleaded that "[b]ecause of [LSRC's] violation of Chapter 4102 of the Insurance Code, Plaintiffs and members of the class are entitled to a judgment restoring all monies paid to [LSRC] under the illegal contract, as ruled in the *Reyelts* Action." At the class-certification hearing, the Keys introduced into evidence the deposition of A-1 corporate representative David Cox. Cox testified in his deposition that A-1 maintained paper copies of all of its contracts; each contract was assigned a job number, which was a letter followed by a number between one and one thousand; for example, A 0001, A 0002, to A 1000 followed by B 0001, B 0002, etc. Cox said that the A's and B's had been destroyed but that "the C's forward are . . . still back there [in the storage area at the office]." Exhibit 10 attached to Cox's deposition is an A-1 contract labeled with job number H0687 that appears to have been signed on May 5, 1999, for a total price of $5,934. The class-certification order provides that "[w]ith respect to damages, the issue is economic and objective. The jury will be asked to return monies paid by or on behalf of the class members. The amount of these monies may be reasonably obtained from [LSRC's] records."

Thus, the Keys proved that through the time-sequential job numbers assigned to each of LSRC's contracts with putative class members from a point

certain in time (i.e., from whatever point in time suit is timely based on the application, if any, of LSRC's statute-of-limitations affirmative defense to the certified class claims for declaratory-judgment and DTPA section 17.50(a)(4) (Violation of Chapter 541 of the Texas Insurance Code) claims, the damages of each class member may be established solely by reference to the amount of LSRC's contract with that class member. *See Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 923–24 (Tex. 2010) (holding that trial court did not abuse its discretion by determining predominance was not defeated by differing amount of damages each class member would be entitled to when calculations could be computed from defendant's records).

LSRC asserts that even if this is true—so that every class member is entitled to statutory disgorgement from LSRC of all monies paid to LSRC under that class member's contract—LSRC nonetheless is entitled to an offset under every contract for the value of the roof it installed. Relying on *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817 (Tex. 2012), LSRC claims DTPA restoration damages necessarily encompass the common-law right of mutual restitution, entitling LSRC to an offset.[33]  *See* Tex. Bus. & Com. Code Ann. § 17.50(b)(3)

---

[33]LSRC limits its argument—that its claimed right of offset defeats rule 42(b)(3) predominance—to the DTPA claims. LSRC's only lack-of-predominance argument concerning the Keys' declaratory-judgment claim is not based on LSRC's claimed right of offset.  Instead, LSRC's only lack-of-predominance argument concerning the Keys' declaratory-judgment claim is that "[t]he Keys' declaratory[-]judgment claim also fails on predominance grounds because it will require an inquiry into whether each claimant has elected to void his or her roofing contract with LSRC—an inquiry not susceptible to class-wide proof . . .

(setting forth remedy of restoration).  LSRC argues that this right of offset as to

the damages of each class member defeats rule 42(b)(3) predominance.

According to the Keys, the plain language of insurance code section 4102.207's

statutory disgorgement provisions precludes LSRC's entitlement to any offset.

We begin with the text of section 4102.207.  It provides:

(a) Any contract for services regulated by this chapter that is entered into by an insured with a person who is in violation of Section 4102.051 may be voided at the option of the insured.

(b) If a contract is voided under this section, the insured is not liable for the payment of any past services rendered, or future services to be rendered, by the violating person under that contract or otherwise.

Tex. Ins. Code Ann. § 4102.207.  This statutory remedy expressly provides that if

an insured voids a contract with an unlicensed insurance adjuster, "the insured is

not liable for the payment of any past services rendered, or future services to be

rendered, by the violating person under that contract or otherwise."  *Id.*

§ 4102.207(b).

Examining the plain language of section 4102.207(b)'s statutory

disgorgement provision, no words or phrases are utilized that could be construed

as contemplating inclusion of the common-law doctrine of mutual restitution.  *Cf.*

*Morton v. Nguyen*, 412 S.W.3d 506, 509–12 (Tex. 2013) (holding statutory

---

[because] a violation of Chapter 4102 merely renders the contract voidable."  We previously addressed this argument in section IV.B. above; the contract is void as to LSRC, and putative class members who wish to enforce their contract with LSRC may opt-out.

property code remedy of "cancellation and rescission" contemplated inclusion of the common-law requirement of mutual restitution); *Cruz*, 364 S.W.3d at 825–26 (explaining DTPA remedy of restoration "provides a prevailing consumer the option of unwinding the transaction, returning the parties to the status quo ante" and therefore contemplates mutual restitution). Unlike the property code provision in *Morton* and the DTPA restoration provision in *Cruz*, the insurance code provision here does not include any language contemplating mutual restitution. *See* Tex. Ins. Code Ann. § 4102.207(b). To the contrary, the insurance code provision here expressly provides that when an insured voids his contract with an unlicensed insurance adjuster, the insured "*is not liable for the payment of any past services rendered, or future services to be rendered, by the violating person under that contract or otherwise.*" *Id.* (emphasis added).

Looking to the entirety of chapter 4102, the legislature's enactment of the following provisions applicable to licensed public insurance adjusters demonstrates that the disgorgement provisions of section 4102.207 are punitive—intended to punish and to deter roofing and construction companies from taking advantage of Texas consumers by purporting to act, while unlicensed, as public insurance adjusters for insureds. *See id.* § 4102.103 (providing that the contract used by a public insurance adjuster must include "a prominently displayed notice in 12-point boldface type that states 'WE REPRESENT THE INSURED ONLY'"), § 4102.111 (providing that all funds received as claim proceeds by a license holder acting as a public insurance

54

adjuster are received and held by the license holder in a fiduciary capacity), § 4102.151 (prohibiting a license holder from soliciting or attempting to solicit a client for employment during the progress of a loss-producing, natural-disaster occurrence), § 4102.158 (prohibiting a license holder from participating directly or indirectly in the reconstruction, repair, or restoration of damaged property that is the subject of a claim adjusted by the license holder). Because unlicensed public insurance adjusters are not subject to the checks, balances, and penalties that licensed public insurance adjusters are, section 4102.207's disgorgement provision is a punitive deterrent.[34] *Cf. Morton*, 412 S.W.3d at 511 (holding property code provision was subject to common-law rescission principles because it "was not intended to be punitive"). To construe section 4102.207 as LSRC desires would in effect render it toothless; if construction companies and roofing companies that are unlicensed as public insurance adjusters are able to successfully solicit repair contracts by agreeing to act as the insured's public insurance adjuster and nonetheless retain the monies paid to them for their repair or roofing services, then from a cost-benefit standpoint, the statute imposes no financial incentive for such companies to stop acting as unlicensed public insurance adjusters. In recognition of this fact, several states have enacted statutory disgorgement provisions similar to section 4102.207(b) that are

---

[34]The brief of Amici Curiae National Association of Public Insurance Adjusters and Texas Association of Public Insurance Adjusters outlines many pertinent policy considerations supporting this construction of the statutory remedy created by the legislature in Texas Insurance Code section 4102.207(b).

applicable to unlicensed contractors or public insurance adjusters and preclude an offset or any type of recovery by the unlicensed contractor or adjuster for any services rendered.[35]  *See, e.g.*, Cal. Bus. & Prof. Code § 7031 (West 2017) (providing that person who utilizes the services of unlicensed contractor may bring action to "recover all compensation paid to unlicensed contractor"); Nev. Rev. Stat. § 624.700(4) (West 2015) (providing that contract entered into by unlicensed contractor is void ab initio).[36]

The trial court here found—albeit in connection with its analysis of rule 42(a)(2)'s commonality requirement—that "[a] related common issue is the manner in which the class member's relief shall be calculated; specifically, whether using such illegal language ultimately requires Defendants to disgorge all monies received under the class members' contracts."  This issue is central to the validity of each putative class member's damage claim, and it can be resolved "in one stroke," justifying class treatment.  *Dukes*, 564 U.S. at 350, 131 S. Ct. at 2551*; see Amchem Prods., Inc.*, 521 U.S. at 623, 117 S. Ct. at 2249–50.  Because the right of every class member (who does not opt out of the class action) to recover damages or to not recover damages may be resolved in one

---

[35]The Keys assert that superimposing a right of offset upon section 4102.207(b)'s disgorgement remedy would "grant the violator the benefits of his illegality."

[36]*See also Morgan Drexen, Inc. v. Wis. Dep't of Fin. Insts., Div. of Banking*, 862 N.W.2d 329, 334 (Wis. Ct. App. 2015) (requiring unlicensed adjustment service company to disgorge all fees paid to it).

stroke, and because the Keys proved that the amount of each class member's damages, if any, is calculable from LSRC's records; that LSRC still possesses such records; and that such records are maintained sequentially in order of the year and date the LSRC contract was signed, we hold the fact that the amount of damage, if any, awardable to each individual class member will vary according to the amount of that class member's contract with LSRC does not defeat predominance. That is, the common question of whether class members are entitled to statutory disgorgement of monies paid pursuant to the LSRC contract "*predominate*[s] over any questions affecting only individual [class] members." *See Amgen Inc.*, 568 U.S. at 468, 133 S. Ct. at 1196.

We hold that the trial court did not abuse its discretion by determining that the common, aggregation-enabling declaratory-judgment claim; the DTPA (Violation of Chapter 541 of the Texas Insurance Code) claims; and the damages issues in the case are more prevalent or important than any noncommon, aggregation-defeating individual issues and specifically are more prevalent and important than the allegedly noncommon statute-of-limitations and damages issues argued on appeal by LSRC as defeating predominance. *See id.* We overrule the portion of LSRC's second issue challenging rule 42(b)(3)'s predominance requirement.

## 2. Superiority

LSRC raises four challenges to the trial court's superiority finding under rule 42(b)(3): the trial court's superiority analysis was "conclusory"; the Keys

57

"failed to address superiority"; "the trial court also improperly shifted the burden to LSRC to adduce evidence defeating some kind of assumption of superiority"; and the Keys' decision not to pursue mental-anguish damages on behalf of the class defeats superiority.

Superiority exists when "the benefits of class-wide resolution of common issues outweigh any difficulties that may arise in the management of the class." *Union Pac. Res. Grp., Inc. v. Hankins*, 51 S.W.3d 741, 754 (Tex. App.—El Paso 2001), *rev'd on other grounds,* 111 S.W.3d 69 (Tex. 2003); *Chastain,* 26 S.W.3d at 34. In determining whether a class action is superior, the trial court may consider the following factors: (1) whether class members will benefit from the discovery that has already been completed, thereby eliminating duplication of effort; (2) whether the trial court has already spent substantial time and effort becoming familiar with the issues of the case, which weighs favorably for a fair and expeditious result; and (3) whether class members have an interest in resolving common issues by class action. *Hankins,* 51 S.W.3d at 754–55; *Chastain,* 26 S.W.3d at 35.

The class-certification order explained:

> The Court further finds that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. In support of this finding, the Court finds that the question of the interest of members of each class in individually controlling the prosecution of separate actions favors certification of each class because, under the record presented, it is simply not practical for the normal, individual class member to prosecute this case individually, and there is no evidence of an interest in individuals prosecuting this case individually. Indeed, it appears

58

from the opinion in *Reyelts* and the facts of this case that the parties' respective claims against Defendants were not raised individually until Defendants had taken action to enforce their contracts against them.

This same fact also supports the Court's finding that the extent and nature of any litigation concerning the controversy already commenced by or against members of the classes favors certification because no party has identified other litigation brought by members of the classes as individual actions other than the claims brought, and already resolved, by Beatrice Reyelts and the claims brought by the Named Plaintiffs in this case. This dearth of claims also establishes the lack of any persuasive evidence that potential class members would want to prosecute their own actions in light of the financial resources necessary to prosecute such a claim.

The Court further finds that the desirability or undesirability of concentrating the litigation of the claims in this forum favors certification of the classes because it would be wasteful to duplicate them in multiple actions[,] and this Court (and the parties and their counsel) has already invested a great deal of time and study.

In support of these findings regarding Rule 42(b)(3), the Court additionally refers to the findings stated in § 5.3 and the trial plan located in § 6, both of which are incorporated by reference as part of the basis on which the Court finds the (b)(3) requirements are satisfied.

The Court further finds that the difficulties likely to be encountered in the management of the classes favors certification of the classes because the issues that will require most of the effort of the Court and parties will be resolved by class-wide evidence.

The Court will order notice to the class and will grant class members the right to opt-out, as more particularly described in § 7.

Contrary to LSRC's contention, the trial court's superiority analysis here, as set forth in the class-certification order and quoted above, is very different from the cursory superiority analysis conducted by the trial court in *Schein. See*

59

102 S.W.3d at 699 (holding inadequate the trial court's single-sentence superiority analysis that stated, "[i]n light of the amount any individual Plaintiff could recover in this case and the fact that Plaintiffs are owners and operators of small businesses, the Court finds that the economics of pursuing their claims individually would not be feasible for the members of both the DOS and Windows subclasses"). Concerning LSRC's complaint that the Keys "failed to address superiority," the Keys' extensive brief in support of class certification specifically addressed and explained how and why rule 42(b)(3)'s superiority requirement is met here.[37] And concerning LSRC's complaint that "the trial court also improperly shifted the burden to LSRC to adduce evidence defeating some kind of assumption of superiority," the record does not support this claim. To the contrary, the record before us reflects that the trial court was aware that the Keys bore the burden of establishing each of the class-certification requisites and did not shift that burden to LSRC.

Concerning LSRC's contention that the Keys' decision not to pursue mental-anguish damages on behalf of the class defeats superiority, no requirement exists that the Keys pursue every claim that they possess on behalf of the class.[38] And no rule precludes the Keys from deciding not to pursue de

---

[37]Although the Keys' brief in support of class certification references rule 42(b)(4), that subsection was renumbered to 42(b)(3) effective January 1, 2004. *See, e.g.*, *Lopez*, 156 S.W.3d at 553 n.2 (reciting that former rule 42(b)(3) was eliminated and that former rule 42(b)(4) became rule 42(b)(3)).

[38]The Keys explain that their claim for mental-anguish damages arose

60

minimis damage claims on behalf of the class. *See Bowden*, 247 S.W.3d at 697.

Moreover, any potential class members having allegedly suffered mental-anguish

damages by virtue of their dealings with LSRC would have known of LSRC's

mental-anguish-causing conduct and likely would have pursued their own claims,

as the Reyeltses did. If few class members have filed individual suits, a court

may conclude that the members do not possess strong interests in controlling

their own litigation; this lack of individual lawsuits supports a finding of

superiority.[39] *See, e.g.*, *Schuler v. Meds. Co.*, No.:14-1149 (CCC), 2016 WL

3457218, at *5 (D.N.J. June 24, 2016) (holding superiority requirement satisfied

in part because "the record in this case does not indicate an interest among

Class Members in individually controlling the prosecution of separate actions"); *In

re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 111 (D.C. Conn. 2005) (ruling on class

certification and holding superiority requirement satisfied in part because "[t]he

> because [LSRC] submitted an altered contract to the Justice Court and obtained a default judgment [against Joe Key]—while simultaneously assuring Joe Key that [LSRC was] working with him to reach an amicable settlement. [LSRC] then began collection efforts. These acts caused mental anguish. Accordingly, [the Keys] have additional non-contractual claims as class representatives often maintain.

The class members' claims are based on the contractual language at issue, not on extracontractual actions by LSRC.

[39]The Keys proved through the deposition testimony of David Cox that LSRC had not taken the position that the Acceptance and Agreement provision that was contained in LSRC's standard form contracts from 2003 to 2013 was ambiguous until "these . . . lawsuits." That is, until the *Reyelts* lawsuit and the Keys' petition. This is further evidence of the lack of separate lawsuits.

61

parties have not identified any other cases involving Celera common stock, which further may indicate a lack of interest in individual prosecution of claims"); 5 James WM Moore, *Moore's Federal Practice* § 23.49[2][b] (3d ed. 1997). We overrule the portions of LSRC's second issue challenging the superiority element of rule 42(b)(3) certification; the trial court did not abuse its discretion by finding this element had been satisfied. *See, e.g.*, *Chastain*, 26 S.W.3d at 34–35 (rejecting challenge to trial court's superiority finding because "discovery ha[d] commenced," the plaintiffs had deposed corporate representatives of defendant, and the defendant had produced voluminous documents; "[t]hus, the class members would benefit from the time and effort invested thus far by the trial court and the parties").

### B. LSRC Agreed to the Trial Court's Consideration of Rule 42(b)(1) and Rule 42(b)(2) Certification

LSRC's third issue is "[w]hether class certification under Rules 42(b)(1) and (b)(2) should be reversed when (a) there is no pleading to support the request under either rule, (b) there is no risk of competing judgments necessary for a (b)(1) class, (c) the class is seeking individualized nonmonetary claims inappropriate for a (b)(2) class, and (d) there is no or insufficient evidence of cohesiveness required for a (b)(2) class."[40] The Keys argue that LSRC waived

---

[40]LSRC argues in two headings in the argument portion of its fourth issue that "Opt-Out Provision Does Not Trump Adequacy Requirement" and that "Not All Class Members Want to void Their Contracts With LSRC." While both of these statements are true, they present no argument that we have not already addressed.

62

its pleading complaint concerning rule 42(b)(1) and 42(b)(2) certification. We agree.

On the record at the class-certification hearing, LSRC pointed out that the Keys' motion for class certification requested certification under only rule 42(b)(3) and that the Keys' requests for certification under rule 42(b)(1) and (b)(2) were added in a later-filed brief. LSRC's counsel stated, "If Your Honor will allow me to file a brief responsive to those sections of their brief related to (b)(1) and (b)(2) after today, then I do not need to file a motion for continuance." The trial court stated that it was "open" to resetting the hearing but after conferring with counsel for the Keys, LSRC's counsel stated, "We're going to formally object to arguing (b)(1) and (b)(2). But [the Keys' counsel] and I agreed . . . that within two weeks of receiving a transcript from the court reporter of the proceedings here today, that we be allowed to file a brief related to the (b)(1) and (b)(2) matters." LSRC subsequently did file a brief with the trial court addressing rule 42(b)(1) and 42(b)(2) certification. LSRC cannot—having failed to move for a continuance, having agreed for the trial court to consider certification under rule 42(b)(1) and 42(b)(2) if LSRC were allowed to file a brief addressing those issues within two weeks of receiving a transcript of the class certification hearing, and having filed such a brief—now assert that the trial court erred by considering certification under rule 42(b)(1) and 42(b)(2). *See In re Dep't of Family & Protective Servs.,* 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding) ("The invited error doctrine applies to situations where a party requests the court to make a specific ruling,

then complains of that ruling on appeal."); *Keith v. Keith,* 221 S.W.3d 156, 164 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding that party who asked trial court to take certain action could not complain on appeal that action was wrong). We hold that LSRC waived its complaint that the Keys did not plead for certification under rule 42(b)(1) or 42(b)(2). We proceed to address LSRC's other complaints regarding rule 42(b)(1) and (b)(2) certification.

### C. The Requirements of Rule 42(b)(2) Are Satisfied; the Rule 42(b)(2) Class Is Indistinguishable from the Rule 42(b)(3) Class

Rule 42(b)(2) permits "class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'" *Cf. Amchem Prods., Inc.*, 521 U.S. at 614, 117 S. Ct. at 2245 (applying Federal Rule of Civil Procedure 23(b)(2), which is substantively identical to rule 42(b)(2)). The rule specifically mentions that claims for declaratory relief may be appropriate for rule 42(b)(2) certification. *See* Tex. R. Civ. P. 42(b)(2). Class-action treatment is particularly useful in this situation because it will determine the propriety of the behavior of the party opposing the class in a single action. *See* 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1775, at pp. 19–20, 21 (1972). The key to the rule 42(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360, 131 S. Ct. at 2557 (quoting Richard A. Nagareda, *Class Certification in the Age*

*of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). That is, a rule 42(b)(2) class must be sufficiently cohesive to warrant adjudication by representation. *See Lapray*, 135 S.W.3d at 667. But the cohesion needed logically lessens if rule 42(b)(2) class members have the right to opt out. *Id.* at 671 (citing John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 435 (2000)). When notice and opt-out provisions are provided to a class certified under rule 42(b)(2), thereby satisfying due-process concerns, a rule 42(b)(2) class becomes virtually indistinguishable from rule 42(b)(3) classes. *Id.* at 667.

Here, the trial court certified the class alternatively under rule 42(b)(3), (b)(2), and (b)(1)(A). The class-certification order mandated notice and opt-out provisions under each of these alternatively-certified rule 42(b) subsections. Because we have held that the trial court did not abuse its discretion by certifying the class pursuant to rule 42(b)(3) and because notice and opt-out provisions are required under the trial court's rule 42(b)(2) certification, the rule 42(b)(2) class essentially collapses into the rule 42(b)(3) class. Accordingly, we hold that the trial court did not abuse its discretion by alternatively certifying a class pursuant to rule 42(b)(2). Because the rule 42(b)(2) class collapses into the rule 42(b)(3) class, we affirm the certification of the class declaratory-judgment and DTPA (Violation of Chapter 541 of the Texas Insurance Code) claims under rule 42(b)(3).

We overrule the portion of LSRC's third issue challenging class certification under rule 42(b)(2).

### D. Rule 42(b)(1)(A) Certification Is Unnecessary

Because we have held that the trial court did not abuse its discretion by certifying the class declaratory-judgment and DTPA (Violation of Chapter 541 of the Texas Insurance Code) claims for class treatment under rule 42(b)(3) or by certifying the class declaratory-judgment claim under rule 42(b)(2) and because we have held that the rule 42(b)(2) class has collapsed into the rule 42(b)(3) class by virtue of the notice and opt-out provisions required for the rule 42(b)(2) class in the certification order, we need not address whether or not the trial court abused its discretion by alternatively certifying a class under rule 42(b)(1)(A).[41] We overrule the balance of LSRC's third issue.

### VII. MISCELLANEOUS COMPLAINT

In one sentence in its fifth issue LSRC complains that "[t]he class certification order is also defective because it fails to include jury instructions. *Vega v. T-Mobile*, 564 F.3d 1256, 1279 n.20 (11th Cir. 2009)." But neither the text of the *Vega* opinion nor the text of footnote 20 supports this contention.[42] We overrule LSRC's fifth issue.

---

[41]The class-certification order's certification of the rule 42(b)(1)(A) class also mandates notice and sets forth opt-out provisions.

[42]To the extent LSRC's fifth issue contains other one-sentence complaints that we have not addressed elsewhere, these complaints are waived. *See* Tex. R. App. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise

66

## VIII. CONCLUSION

Having sustained the portions of LSRC's first, second, and third issues challenging class certification of the Keys' DTPA section 17.50(a)(3) (Unconscionability) claim, we reverse that portion of the trial court's class certification order and remand the cause to the trial court with instructions to decertify the DTPA section 17.50(a)(3) (Unconscionability) claim. Having overruled the remaining portions of LSRC's first and third issues, having overruled LSRC's fourth and fifth issues, and having determined that we need not address the portions of LSRC's third issue challenging class certification under rule 42(b)(1)(A), we affirm the remainder of the trial court's class-certification order. We remand this cause to the trial court for further class proceedings.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MEIER, JJ.

DELIVERED: August 3, 2017

---

argument for the contentions made, with appropriate citations to authorities and to the record"); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (recognizing long-standing rule that error may be waived through inadequate briefing); *Magana v. Citibank, N.A.*, 454 S.W.3d 667, 680–81 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (holding party failing to adequately brief complaint waived issue on appeal), *abrogated on other grounds by Kinsel v. Lindsey*, No. 15-0403, 2017 WL 2324392, at *8 n.4 (Tex. May 26, 2017).